UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>DEREK GOULD,<br><br>　　　　Defendant. | Case No. 21-cr-00475-JSW-1<br><br>**ORDER GRANTING, IN PART, AND DENYING, IN PART, MOTION TO SUPPRESS AND SETTING STATUS CONFERENCE**<br><br>Re: Dkt. No. 75 |

Now before the Court for consideration is the motion to suppress filed by Derek Gould ("Mr. Gould"). The Court has considered the parties' papers, relevant legal authority, the record in this case, and the parties' arguments at the hearing held on July 26, 2022. The parties do not believe an evidentiary hearing is required to resolve the motion, and the Court concurs. For the reasons set forth in the remainder of this Order, the Court GRANTS, IN PART, AND DENIES, IN PART Mr. Gould's motion to suppress.[1]

## BACKGROUND

On August 9, 2021, the Government charged Mr. Gould by complaint with a violation 18 U.S.C. section 922(g) ("Section 922(g)"), felon in possession of a firearm. (Dkt. No. 1.) On December 9, 2021, the Government charged Mr. Gould by information with one count of violating Section 922(g), and Mr. Gould subsequently waived proceeding by indictment. (Dkt. Nos. 43, 50.)

---

[1] Mr. Gould initially moved to suppress statements as well as evidence, but he did not address the Government's arguments that (1) Officer Woody did not interrogate Mr. Gould; and (2) that it does not intend to use post-invocation statements in its case in chief. Accordingly, the Court DENIES the motion to the extent it relates to his statements.

1

These charges arise out of Mr. Gould's arrest on February 14, 2021, by Richmond Police Department ("RPD") Officer Alayna Woody ("Officer Woody"). On that day, Officer Woody was driving westbound on Macdonald Avenue from 23rd Street in Richmond, when she observed a black Mercedes-Benz (the "vehicle"). The vehicle, which was travelling eastbound on Macdonald Avenue, did not have a front license plate and had tinted windows. (Dkt. No. 76, Declaration of Elisse Larouche ("Larouche Decl."), ¶ 1; Dkt. No. 76-1, Ex. A (Police Report at DG 000119); *see also* Dkt. No. 80-1, Declaration of Officer Alayna Woody ("Woody Decl."), ¶¶ 5.)

Officer Woody made a U-turn to position her car behind the vehicle, but the driver, later discovered to be Mr. Gould, continued eastbound through the intersection of Macdonald Avenue and 23rd Street and made a left turn into a McDonald's parking lot at 2301 Macdonald Avenue. (Woody Decl., ¶ 6.) Officer Woody was unable to make turn into the parking lot because of on-coming traffic, so she proceeded eastbound on Macdonald Avenue and turned northbound onto 24th Street. The parking lot had another exit on Nevin Avenue, and Officer Woody turned west on Nevin Avenue from 24th Street. Officer Woody observed Mr. Gould begin to exit the lot. According to Officer Woody, Mr. Gould "abruptly stopped" and reversed back into the lot. At that point, Officer Woody turned her emergency lights on and initiated a traffic stop. (*Id.*, ¶ 6-7; *see also* Police Report at DG 000119.)

Officer Woody activated her body-worn camera ("BWC") and approached Mr. Gould's car from the passenger side. (Larouche Decl., ¶ 3, Ex. B (Woody BWC-1).)[2] As she approached, the BWC footage shows that the passenger side window has been lowered, and when she reached the passenger side, Mr. Gould shows Officer Woody his passport. Officer Woody attests that his hands and legs were shaking when he handed her the passport and that he began to speak rapidly.

---

[2] The Government submitted 2 additional videos from Officer Woody's BWC. The first video contains the relevant footage. The audio portion does not begin until approximately 30 seconds into the footage. (*See* Woody Decl. ¶ 8.) Officer Woody attests that at some unspecified point she saw Mr. Gould "leaning toward the passenger side of the vehicle and appeared to be reaching in the center console and underneath either the front driver or passenger seat." Based on her training and experience, she attests those are areas where people sometimes attempt to conceal contraband. (Woody Decl., ¶ 10.) That is not captured on the BWC footage. But, as noted, by the time she exited her vehicle, Mr. Gould had been lowered the passenger side window.

2

To her, Mr. Gould appeared nervous. The Court did not observe Mr. Gould's hands or legs shaking, but when the audio begins, he does speak rapidly. Although it is not captured on the audio, Officer Woody attests Mr. Gould also told her that his daughter was in the car. (Woody BWC-1 at 0:19-39); *see also* Woody Decl., ¶¶ 9-10, 12.)

Officer Woody asked Mr. Gould why he had not "pulled out," he stated he had not seen her because he was looking at his GPS and showed her his phone. (*Id.* at 0:29-39.) Officer Woody asked Mr. Gould if he had another form of identification, and Mr. Gould told her he had just returned from Miami, where he lost his identification. When asked, Mr. Gould advised Officer Woody that he has a valid driver's license. (*Id.* at 0:41-1:15) Mr. Gould continued to talk to Officer Woody about the vehicle registration and ownership information, and Officer Woody asked if he was on probation or parole. Mr. Gould responded he was not but that "ESRP" might come up. (*Id.* at 1:15-1:35.) At that point Officer Sequeira arrived on scene and approached Mr. Gould's side of the vehicle. (*See, e.g., id.* at 1:17-1:18, 1:57-2:08; Larouche Decl., ¶ 5, Ex. D (Sequeira BWC at 0:00-0:13).)

Officer Woody then walked to the rear of Mr. Gould's vehicle, provided his license plate number to dispatch, and then proceeded to her vehicle to run a records check.[3] Officer Woody muted her BWC, pursuant to RPD policy, and ran Mr. Gould's name through the CLETS and Aries databases and communicated with dispatch.[4] (Woody BWC-1 at 1:57-5:56; Woody Decl., ¶¶ 16, 18.) Officers Farr and Hodges also arrived on scene.[5] Officer Farr asked Officer Woody "whatcha got," and Officer Woody responded, "we'll see" and "he's a weirdo, though" and told

---

[3] While Officer Woody is in her patrol vehicle, Officer Sequeira remained with Mr. Gould and engaged him in conversation about his trip to Miami, including whether there was "big pimping" and then said she meant "big living." Mr. Gould advised Officer Sequeira that he had lost his identification in Miami but that he had a valid driver's license. Officer Sequeira responded, "you're not on probation and parole," and Mr. Gould advised he was not. Officer Sequeira also asked Mr. Gould if he had anything in the car he should not have, and he shook his head "no". (Sequeira BWC at 0:32-2:00.)

[4] Officer Woody also muted the BWC-1 footage at approximately for about a minute after she reported she found the gun. (Woody BWC-1 at 9:30-10:25.)

[5] The footage from Officer Farr's BWC captures the audio of Officer Woody's communications with dispatch. (Larouche Decl., ¶ 4, Ex. C (Farr BWC at 0:42-2:54).)

3

Officer Farr Mr. Gould tried to ditch her when she flipped around on him by pulling immediately into McDonalds and, when she approached from the Nevin Avenue side of the lot and waited for him, he crept out and then tried to reverse back in. (Farr BWC at 0:34-0:41, 2:46-2:54; *see also* Woody BWC-1 at 5:50-5:54 (Woody motioning).) The dispatch officer eventually responded that something unintelligible was "valid" and provided Officer Woody with Mr. Gould's address. Officer Woody then asked dispatch if Mr. Gould was "clear Aries," and the dispatch officer asked her to define "clear." Officers Woody laughed and then stated, "you know what I mean" and lowers her voice to say "probation, parole." The dispatch officer advised her that Mr. Gould is "negative to both." (Farr BWC at 2:08-2:36.) The record searches did show that the vehicle's registration had expired in July 2020. (Woody Decl., ¶ 19.)

After Officer Woody completed the records check, she returned to the driver's side of Mr. Gould's vehicle and asked Mr. Gould whether he had anything illegal in the car. Mr. Gould responded "no", and Officer Woody asked if she could check. Mr. Gould did not consent to the search, and Officer Woody then stated, "I can smell the weed and I see you that could have been smoking. So, I'm going to do a quick check." (Woody BWC-1 at 6:04-6:24.) Mr. Gould stated his daughter was in the car, and Officer Woody stated that it would be real quick and that his daughter would be okay. Officer Woody told Mr. Gould to put his hands on top of his head, asked "nothing illegal, no weapons," and told Mr. Gould to exit the vehicle. After he was out of the vehicle, Officer Woody conducted a pat-down search and said he could sit on the bumper of her car. (*Id.* at 6:25-7:11.)

Officer Woody reported and attests that, as she was approaching the vehicle, she "smelled an overwhelming odor of burnt marijuana coming from inside the vehicle" and could smell "burnt marijuana as [she] was arriving at the front passenger door before [she] asked the driver any questions." (Woody Decl., ¶ 9; *see also* Police Report at DG 000119.) Mr. Gould attests that he had not smoked marijuana in the vehicle that day and attests the vehicle did not smell like marijuana when he was stopped and questioned by the RPD. (Dkt. No. 86, Declaration of Derek Gould, ¶ 3.) Although there is no evidence that marijuana was found in the vehicle, there was a box of cigars and two burnt cigars in the ashtray. (Dkt. No. 87, Declaration of Kalei Aichu

4

("Aichu Decl."), ¶¶ 2, 4, Ex. 2.) Officer Woody submitted a supplemental declaration in which she attests that in her experience, people add marijuana to these cigars, which are known as "blunts." (Dkt. No. 96-1, Sur-Reply Declaration of Alayna Woody, ¶¶ 4-5)

After Officer Woody directed Mr. Gould to her patrol car, she began to search the driver's side of the vehicle and a jacket on the driver's seat, and spoke with Mr. Gould's daughter. (Woody BWC-1 at 7:12-7:18.) Other video footage shows that as Mr. Gould approaches Officer Woody's car, he looks back and runs from the scene. (Sequeira BWC at 6:00-6:03; Farr BWC at 4:11-4:14.) Although Officer Woody started to chase Mr. Gould with the other officers, she returned and searched the passenger side of the vehicle. She then returned to the driver's side and repeatedly told Mr. Gould's daughter that everything was okay. Approximately 8 minutes into the video footage, Officer Woody reported she discovered a gun, which was in the right pocket of Mr. Gould's jacket. (Woody BWC-1 at 7:19-8:21; Woody Sur-Reply Decl. ¶ 3.)

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated...." U.S. Const. amend IV. Warrantless searches are *per se* unreasonable. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). Accordingly, the Government bears the burden to show an exception applies by a preponderance of the evidence. *See United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987).

The Government relies on the automobile exception, which permits a "warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). The Government offers two alternative arguments in opposition to Mr. Gould's motion: (1) Mr. Gould abandoned the vehicle and its contents when he ran from the scene; (2) the officers inevitably would have discovered the firearm as part of an inventory search.

**A.     The Initial Stop Was Valid.**

The initial seizure in this case took place when Officer Woody initiated the traffic stop. The Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles

that fall short of traditional arrests." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). The failure to have a license plate attached to the front of a vehicle is a violation of California Vehicle Code section 5200(a). The Court concludes that Officer Woody had a valid basis to stop Mr. Gould.

**B.     Officer Woody Unreasonably Prolonged the Stop.**

The reasonable duration of a traffic stop depends on the stop's mission—to address the traffic violation that triggered the stop and "attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). That "mission includes 'ordinary inquires incident to [the traffic] stop,'" which typically involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). A law enforcement officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but they may not "do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* An officer may prolong a permissible traffic stop only if the additional time is "(1) part of the stop's mission or (2) supported by independent reasonable suspicion." *United States v. Landeros,* 913 F.3d 862, 868 (9th Cir. 2019).

**1.     The inquiries into Mr. Gould's probation and parole status were not part of the stop's mission.**

There is no dispute that it was permissible for Officer Woody to run a check of the vehicle's license plate and registration and to check Mr. Gould's criminal history. *See, e.g., United States v. Nault*, -- F.4th --, 2022 WL 2840584, at *4-*5 (9th Cir. July 21, 2022) (concluding officer had "strong interest in ensuring [defendant] had the ability to legally operate his vehicle"); *United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022) (holding that conducting a "criminal history check is a negligibly burdensome precaution required for officer safety"). However, the Ninth Circuit has not yet decided if asking a driver whether they are on probation or

6

parole is part of the mission of a traffic stop. Several courts within this District have held it is not, reasoning the question "is not aimed at ensuring that vehicles on the road are operated safely and responsibly" but "is intended to uncover evidence of criminal activity." *United States v. Mati*, 466 F. Supp. 3d 1046, 1056 (N.D. Cal. 2020); *see also United States v. Ward*, No. 16-cr-00485-JST-1, 2017 WL 1549474, at *3 (N.D. Cal. May 1, 2017), *Amanuel v. Soares*, No. 13-cv-5258-NC, 2015 WL 3523173, at *7 (N.D. Cal. June 3, 2015).

Officer Woody asked Mr. Gould about his probation status before she conducted the records check and asked dispatch whether he was clear on ARIES and stated she was referring to his probation and parole status. The Court concludes these inquiries went beyond the mission of the traffic stop. It also concurs with the opinions cited above that it is irrelevant whether posing the questions may add only a *de minimis* time to the stop. *See also United States v. Odom*, No. 21-cr-259-JST, -- F. Supp. 3d --, 2022 WL 611206, at *4 (N.D. Cal. Mar. 2, 2022) (citing cases). Therefore, unless Officer Woody had reasonable suspicion or probable cause to believe Mr. Gould was engaged in criminal activity, his seizure was unconstitutional.

**2.     Officer Woody Lacked Probable Cause or Reasonable Suspicion to Prolong the Stop or to Search the Vehicle.**

To determine whether probable cause exists, the Court asks whether, under the totality of the circumstances, there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Reasonable suspicion" exists where officers, based on the totality of the circumstances, have a "particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273. Although a "mere hunch" will not suffice, "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The Government relies on the following factual circumstances to argue that Officer Woody had both probable cause and reasonable suspicion to support her actions: it appeared Mr. Gould tried to evade the traffic stop, he appeared to make furtive movements around the passenger seat

7

and center console, he appeared nervous and had his identification ready before she asked him for it, and she smelled burnt marijuana. Officer Woody also attests she saw Mr. Gould's daughter was not in a car seat.[6] Officer Woody does not attest Mr. Gould was driving erratically or unsafely before he turned into the parking lot. Although she did do a U-turn after she saw his vehicle, Officer Woody had not otherwise indicated to Mr. Gould that she intended to stop him and did not activate her lights until Mr. Gould purportedly "abruptly stopped" and reversed back into the parking lot. When she asked him about this, he claimed not to have seen her and said he was looking at his GPS. *See, e.g., United States v. Jones*, 438 F. Supp. 3d 1039, 1057 (N.D. Cal. 2020) (concluding that even if defendants' driving could be "characterized as 'evasive'," it did not provide reasonable suspicion to believe they "engaged in any criminal conduct").

Mr. Gould did speak rapidly to Officer Woody at first. During his interaction with Officer Sequeira, he shifts in his seat at one point but otherwise appears calm. (*See, e.g.,* Sequeira BWC at 1:54-4:59.) Assuming for the sake of argument that Mr. Gould appeared nervous to Officer Woody, that fact does not necessarily support an inference of criminal behavior because "[e]ncounters with police officers are necessarily stressful for law abiders and criminals alike." *United States v. Chavez-Valenzuela,* 268 F.3d 719, 726 (9th Cir. 2001), *overruled on other grounds by Muehler v. Mena,* 544 U.S. 93 (2005). The Court also does not find Officer Woody's reliance on the fact that Mr. Gould was reaching around the passenger side of the car and the center console as she approached to be a compelling factor, in light of the fact that she admits she approached him from that side because he had backed into the parking lot.

The Government relies heavily on the fact that Officer Woody states she smelled the odor of burnt marijuana as she approached Mr. Gould's vehicle.[7] In November 2016, California voters passed Proposition 64, which made it legal for individuals 21 years or older to possess less than

---

[6] An officer may routinely order an individual out of a vehicle as part of a traffic stop without violating the Fourth Amendment's prohibition on unreasonable seizures. *See Pennsylvania v. Mimms,* 434 U.S. 106, 111 (1977). The Government does not rely on *Mimms* to justify Officer Woody's decision to order Mr. Gould out of his car.

[7] Officer Woody attests that she has had experience with the smell of burnt marijuana in approximately 200 traffic stops. (Woody Decl. ¶ 9.)

8

28.5 grams of marijuana. *See* Cal. Health & Safety Code § 11357(b)(2). Under Proposition 64, "[c]annabis and cannabis products involved in any way with conduct deemed lawful by this section *are not contraband* nor subject to seizure, and *no conduct deemed lawful by this section shall constitute the basis for detention, search, or arrest*." *Id.* § 11362.1(c) (emphasis added). Following the enactment of Proposition 64, a number of courts have held that the odor of marijuana *alone* will not support probable cause for a vehicle search. *See, e.g., United States v. Martinez*, 811 Fed. Appx. 396, 397 (9th Cir. 2020); *United States v. Talley,* 467 F. Supp. 3d 832, 835-36 (N.D. Cal. 2020); *Jones*, 438 F. Supp. 3d at 1053-54; *United States v. Maffei*, 417 F. Supp. 3d 1212, 1223-29 (N.D. Cal. 2019); *Blakes v. Sup. Ct.*, 72 Cal. App. 5th 904, 911 (2021); *People v. Johnson*, 50 Cal. App. 5th 620, 628-34 (2020).

California still prohibits possession of "an open container or open package of cannabis or cannabis products while driving, operating, … of a motor vehicle" and prohibits smoking or ingesting cannabis or cannabis products while driving or operating a motor vehicle. Cal. Health & Safety Code §§ 11362.3(a)(4), (7); *see also* Cal. Veh. Code § 23222(b). Officer Woody admits that she cannot recall exactly when she observed the cigars, only that it was at some point before she asked Mr. Gould to step out of the car. (Woody Sur-Reply Decl., ¶ 6.)[8]

The Government argues the facts here are analogous to facts in *People v. Fews*, 27 Cal. App. 5th 553 (2018). In that case, the officers observed a car directly in front of their vehicle speed up then abruptly pull over into a red-zone. *Id.* at 556-57. At some point during the stop, the officer observed the driver of the vehicle, who had not completely complied with the officers' directives, with a package of cigars and a half-burnt blunt in his hand. The officer testified he smelled the odor of recently burnt marijuana emanating from the driver, and when he asked if the cigar contained marijuana, the driver admitted it did. *Id.* at 558. The officers discovered a gun

---

[8] Officer Woody explains she used the term "marijuana cigarettes" in her police report and her initial declaration instead of "blunt" because the latter is a slang term, which she does not usually use in her reports and because someone may not know what a blunt is. (Woody Sur-Reply Decl., ¶¶ 4-5.) Officer Woody also attests that one of the cigars depicted in the screen captures from her BWC footage "appears smoked – only a small portion of it is remaining, the rest of it having been smoked already." (*Id.*) The Court accepts Officer Woody's characterization of the state of the cigars in the ashtray.

when doing a pat-search of the defendant, who was a passenger in the vehicle, and he moved to suppress. *Id.* at 557-58.

The court concluded the officers had reasonable suspicion to conduct the pat-search based on the driver's actions and the odor of marijuana and because the officers had seen the defendant make what appeared to be furtive moments while still in the vehicle, and because the officers testified the area was known for violent crimes and drugs. *Id.* at 561. It also upheld the search of the vehicle, concluding that the odor of marijuana and the driver's admission that there was marijuana in the cigar created a "fair probability that a search of the [vehicle] might yield additional contraband or evidence" of driving under the influence "or, at the very least, driving while in possession of an open container of marijuana." *Id.* at 563.

There are some similarities between this case and *Fews*. In her police report, Officer Woody stated "this area is known for violent crimes," including robberies and shootings, but she does not explicitly define the "area" in question. Officer Woody also did not include that information in her declaration, and, in contrast to *Fews,* the Government does not rely on it as a factor. Like the officer in *Fews,* Officer Woody states she smelled burnt marijuana, a fact that distinguishes this case from *Jones, Maffei*, and *Hall*. Officer Woody also attests she saw what she believed to be a blunt. Although she attests she could not tell when it had been smoked, she opines it was recent because the marijuana did not smell "stale." (Woody Decl., ¶ 9.) Officer Woody does not, however, provide a temporal scope for what she would consider "stale." *See, e.g., Blakes*, 72 Cal. App. 4th at 921 (noting detectives could not determine "if the marijuana was freshly burnt"); *People v. Shumake*, 45 Cal. App. 5th Supp. 1, 8 (2019) (noting officer testified that "smell of marijuana can linger for a week or more").

Unlike the officer in *Fews,* Officer Woody did not ask Mr. Gould if the cigars did contain marijuana. She simply told him she smelled weed and saw he "could" have been smoking. There also is no evidence that she ever examined the cigars to confirm they were the source of the odor or saw other evidence suggesting there was marijuana in the car. *Cf. People v. Hall*, 57 Cal. App. 5th 946, 949 (2020) (holding no probable cause to search car where, *inter alia,* officer saw burnt cigar wrappers and plastic bag of green leafy substance, but did not smell the wrappers to

10

determine if they smelled of marijuana). Officer Woody did not report, and has not attested, that she saw any signs Mr. Gould was impaired. She also did not perform any sobriety tests or provide any indication that he was under the influence of a marijuana.[9] Thus, her conduct was not "consistent with the type of reasonable inquiry officers use when the smell alcohol in a car." *Shumake*, 45 Cal. App. 5th at 4, 8 (holding officer lacked probable cause to search for open container even though she testified to smelling freshly burnt marijuana where there was "no partially smoked cannabis in plain view").[10] The Court also finds it significant that when Officer Farr asked "whatcha got", Officer Woody said "we'll see." *See, e.g., Jones*, 438 F. Supp. 3d at 1057 (finding officers statements during traffic stop were "compelling evidence that the officers were acting on an unparticularized suspicion or hunch that there was something 'a little weird' going on").

The Court concludes that *Fews* is distinguishable on its facts. Therefore, even crediting Officer Woody's testimony that she smelled burned marijuana, when the Court evaluates the totality of the circumstances, it concludes that she lacked reasonable suspicion to prolong the traffic stop by waiting to obtain information about Mr. Gould's probation and parole status. The Court also concludes that Officer Woody did not have probable cause to order Mr. Gould out of the car and conduct a vehicle search.

//

//

---

[9] The Government does not appear to rely on the fact that Mr. Gould's daughter was not in a car to argue Officer Woody had probable cause to believe Mr. Gould engaged in criminal activity. The Court concludes that fact is more relevant to its argument on inevitable discovery.

[10] Based on the BWC footage before the Court, none of the other officers on scene refer to smelling marijuana, burnt or otherwise. Officer Woody also did not say anything about smelling marijuana until after Mr. Gould declined to consent to a search of his vehicle. The Government did not include declarations from any of the other officers on scene to corroborate Officer Woody's testimony on this point. At the hearing, the Government asked for leave to submit a declaration from Officer Alvarado, who the Government proffered would testify she recalled smelling marijuana. Officer Alvarado did not include that fact in her police report. (Dkt. No. 85, Supplemental Declaration of Elisse Larouche, ¶ 4; Dkt. No. 85-3, Ex. J to Larouche Declaration.) Assuming for the sake of argument she did smell marijuana, the Court concludes that evidence would not alter its analysis. Therefore, the Court DENIES the Government's request for leave to submit a further declaration.

**C.     The Government's Alternative Arguments Do Not Justify the Search.**

**1.     Abandonment.**

The Government argues that the gun was not tainted by any prior illegality because Mr. Gould abandoned the vehicle when he fled from the scene. "[W]arrantless searches or seizures of abandoned property do not violate the [F]ourth [A]mendment, … [and] persons who voluntarily abandon property lack standing to complain of its search or seizure[.]" *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960) and *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976)). However, if "abandonment must be voluntary, and … abandonment that results from Fourth Amendment violation cannot be voluntary." *United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000).

Because the Court has determined that Officer Woody unreasonably prolonged the stop without probable cause or reasonable suspicion and did not have a valid basis to order Mr. Gould out of the vehicle to conduct the search, the Court concludes that Mr. Gould did not voluntarily abandon the car.

**2.     Inventory Search.**

The Government also argues the gun would have been discovered during an inventory search once Officer Woody determined the car should be impounded based on the expired registration. *See* Cal. Veh. Code § 22651(o)(1)(A). Section 22651 and the RPD's policy of vehicle towing permit a car to be towed in those circumstances, but they do not require it. *Id.*; *see also* Woody Decl., ¶¶ 20-21; Dkt. No. 80-1, Declaration of Ilham Hosseini, ¶ 2, Ex. A (RPD Tow Policy, § 510.1).) Moreover, "[t]he fact that an impoundment complies with a state statute or police policy, *by itself,* is insufficient to justify impoundment under the community caretaking exception." *Cervantes,* 703 F.3d at 1142 (emphasis added, internal citations and quotations omitted); *cf. Blakes*, 72 Cal. App. 5th at 913 (stating "decision to impound vehicle must be justified by a community caretaking function" and concluding fact that driver had suspended license did not serve that function) (internal quotations and citations omitted).

The Government does not provide any argument to support a conclusion that impounding

12

Mr. Gould's vehicle satisfied a community caretaking function. Accordingly, the Court concludes it has failed to meet its burden to rely on the inevitable discovery doctrine.

**CONLCLUSION**

For the foregoing reasons, the Court GRANTS, IN PART, AND DENIES, IN PART Mr. Gould's motion. The parties shall appear on August 16, 2022 at 12:00 p.m. for a telephonic status conference, and they shall meet and confer to determine if an exclusion of time between the date of this Order and August 16 is appropriate.

**IT IS SO ORDERED**.

Dated: August 10, 2022

_____
JEFFREY S. WHITE
United States District Judge